SHREVE, ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 370, September Term, 1965.]

614

*Decided July 27, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-MOND, HORNEY, MARBURY and McWILLIAMS, JJ.

*Arthur W. Machen, Jr.,* and *J. Elmer Weisheit, Jr.,* with whom were *William H. Gorman, II, Henry F. Leonnig* and *Venable, Baetjer & Howard* on the brief, for appellants.

*Ambrose T. Hartman, Deputy City Solicitor,* with whom were *Joseph Allen, City Solicitor,* and *S. Lyles Freeland, Assistant City Solicitor,* on the brief, for appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

Just about 100 years ago, Baltimore City (the City) condemned some 55 acres of land, which were located in Baltimore County and belonged to Charles A. Buchanan. A large portion thereof is now the bed of Lake Roland. The only question involved is whether the City obtained a fee simple (sometimes referred to as a fee simple absolute) estate in the land as a result of the condemnation proceeding or something less than a fee simple estate therein.

The City condemned under the authority of Chapter 376 of the Acts of the General Assembly of 1853 (the Act), which stated that it was an Act "for supplying the city of Baltimore

with pure water." Section 1 provided that the City could "contract for, purchase, lease and hold * * * in fee simple, or for a term of years, any land * * * spring, brook, water and water course, and also the right to use and occupy forever or for a term of years" any land, spring, brook, etc., which the City might "conceive expedient and necessary for the purpose of conveying water into the said city."

Section 2 provided that if the owners "of such land * * * spring, brook, water, or water course * * * earth, timber, stone or other materials, or with the * * * owners of such ground through which" the City might "find it necessary to have a right of entry and passage, for the purpose of conveying the said water into the said city" and the City could not agree, then the City would have a right to condemn. The procedure prescribed was, more or less, standard at that period of time: a Justice of the Peace issued his warrant to the sheriff directing him to summon a jury; the jury assessed the property owners' damages in an inquisition; the inquisition was filed with the clerk of the Circuit Court to be confirmed by the court at its next session, if no sufficient cause to the contrary were shown.

The only remaining portions of the Act of particular pertinence to the case at bar follow. The jurors were directed "to inquire into, assess, and ascertain [the money to be paid by the City] for the *land,* spring, brook, water rights *or other property* which [the City] *may deem necessary to purchase and hold or use for the purpose;* * * * [and each juror was required to make an oath or affirmation] that he would justly * * * value the damages which the owners * * * [would] sustain by the *use and occupation of said property* * * *." If the first inquisition were not confirmed, the court should "direct another inquisition in the manner above described, and such inquisition shall describe the property taken, *or the bounds of the land condemned, and the quantity or duration of the interest in the same,* * * *, and such valuation, when paid or tendered * * * *shall entitle* [*the City*] *to the use, estate and interest in the same* * * * *as fully as if it had been conveyed by the owner or owners of the same* * * *."* (All emphasis added.)

On or about October 6, 1857, the City, having failed in negotiations to purchase Mr. Buchanan's property, condemned the same. The City's letter to the Justice of the Peace directed him

"to summon a jury * * * to meet on the premises for condemnation of said lands." The warrant to the sheriff directed him to summon a jury "to value the said lands," and to "value the damages which the [owner] will sustain by the use and occupation of said property or such part thereof as may be taken by [the City]." The notice to the property owner informed him of the condemnation proceeding and stated that its purpose was "to value the damages which will be sustained by you by the condemnation of [your] property for the use and occupation of [the City] for conveying water into said City." The sheriff's return, which included the inquisition, stated that the jury had been shown "the tract of land within described and the plat thereof * * * and [he] directed the said Jury to estimate the damages resulting to the [owner] *from the taking of said land and also the Fee Simple estate therein* for the conveying of water to the City * * *." The inquisition, signed personally by each juror, said that the jurors had been summoned "to value the damages which the [owner] will sustain by the use and occupation of the Piece or Parcel of land in said County the Fee Simple thereof by [the City]." After lengthy metes and bounds descriptions of the parcels taken, the inquisition not only included the land in its assessment of damages but added "together with the appurtenances and Water rights: which said * * * parcel of land is required by [the City] for conveying Water into said City." It further provided that "the right to use the private Road at Station number twenty is to be retained by [the owner], his heirs and assigns forever * * *," and assessed the damages resulting from "the taking, use and occupation" at $13,000, roughly $235 per acre.

Later, the owner and the City agreed upon certain changes in the metes and bounds named in the inquisition, but no objections were filed to its being confirmed and the court did so on March 1, 1858. Thereafter, the property owner directed the clerk of the court to "enter the verdict of the Jury * * * satisfied." [1]

1. We have quoted from several of the writings required in proceedings of this nature, for in Maryland, all of the papers returned by the sheriff to the clerk are to be regarded as one whole and are to be construed together. Tide Water Canal Co. v. Archer, 9 G. & J. 479; Consolidated Gas Co. v. Baltimore City, 105 Md. 43.

The City took possession of the property, and, together with other land separately purchased or condemned, used it for some ninety years as part of its water system or as a standby reservoir. In 1945, the City ceased utilizing the same for that purpose, and now operates it and the adjoining area as a recreational facility.

The appellants are described in their brief as "the successors in title to the late Charles Adams Buchanan," and those upon whom title will devolve, if they are successful herein. They filed suit in ejectment asking a return of the property and $1,-500,000 in damages for its detention, and, after demand under Maryland Rule 326, they produced copies of the condemnation proceeding. The appellees demurred; the trial court sustained the demurrer without leave to amend; this appeal followed.

Upon the above statement of facts, the case has been ably and thoroughly prepared and presented by counsel on both sides.

At this stage, our single question—Did the City acquire fee simple title to the property as a result of the condemnation proceeding?—assumes dual aspects. First, did the City have the power to make a fee simple taking of the property, and second, if it had such authority, did it, in fact, make such a taking under the condemnation proceeding?

I

Involved in this first facet are several principles so well-known and fundamental in nature that no citation of authority is necessary to sustain them. It is elementary that private property cannot be taken under the authority of eminent domain unless it be for a public purpose. And where there are constitutional or statutory limitations upon the quantum or duration of the estate permitted to be taken, those limitations, when properly raised in court, must be recognized and adhered to. Appellants, with commendable zeal and industry, have set forth in their brief an interesting and instructive historical background relating to the condemnation of property, in an effort to show that the City had no authority, under the Act, to make a fee simple taking. We would deem it appropriate to consider the same and elaborate thereon at greater length in this opinion, were it not for the fact that we recently passed upon nearly

if not all the arguments raised here in *State Roads Comm. v. Johnson*, 222 Md. 493. Also compare *Ligon v. Potomac Electric Power Co.*, 219 Md. 438.

For the purposes of this appeal, we shall assume, without deciding, that the heirs and successors in title of Mr. Buchanan lost no rights as a result of no caveat or exceptions being filed to the ratification of the inquisition in the condemnation proceeding.[2]

At this point, the main thrust of appellants' argument is to the effect that, although the City was specifically empowered *to purchase* fee simple titles, the Act did not explicitly and in precise terms authorize *the condemnation* by the City of a "fee simple" estate, even though other legislative acts, at various times, did. They claim that this demonstrates the Legislature knew how to grant the right to take absolute title when it wanted to by the use of such express terms, and the failure to use, explicitly, the term "fee simple" in Section 2 of the Act proves that the Legislature did not intend for the City to have this power and authority. This argument overlooks the universally-recognized rule of statutory construction that the legislative intent in enacting a law is to be gathered by a consideration of the enactment as a whole, which we shall do below. *Pumphrey v. County Com'rs of Anne Arundel County*, 212 Md. 536; *Shub v. Simpson*, 196 Md. 177; *Fisher v. Bethesda Discount Corp.*, 221 Md. 271. A following of appellants' argument here would have required a different result in *Johnson, supra,* where the principal question involved was whether the condemnor (a railroad company) had the authority to take, and did take, a fee simple estate in property or only an easement therein, under Sections 14 and 15 of Chapter 123 of the Acts of 1826 wherein the terms "fee simple," "fee simple absolute," "absolute estate," or similar ones are nowhere to be found. See also *Taylor v. Baltimore,* 45 Md. 576, a case cited by appellants, wherein this Court stated:

---

2. Appellee has carefully briefed and argued the question as to whether or not the failure to file such exceptions precludes a determination of the issues that could have been raised in a later proceeding, but it is not necessary for us to reach the question here.

"The Act [the Act involved in this appeal] * * * is very full and general in its language * * *. * * * the power conferred upon the authorities of the city to purchase, etc., is in two aspects: The first is to purchase *in fee-simple, or for a term of years,* any of the property mentioned, and the second is to purchase *the right to use or occupy forever, or for a term of years,* the same enumerated property [italics in the opinion]. It is apparent * * * that the Legislature contemplated that the city might require, according to the exigencies of the case, the *absolute title* to the surface, as for example, for the construction of reservoirs; and then again, the right only *to use and occupy* the land for tunnels and conduits. If it were otherwise, and it was designed that there should be a condemnation always of the surface, why, *in addition to the power to condemn in fee,* should the power also be given to condemn the right *to use and occupy?* A fair construction of the Act shows that the power has been conferred to subject such land, as it may be necessary to take, to precisely the use and occupation that may be necessary to accomplish the purpose and end designed,— that is, the introduction of a supply of water into the city limits." (Later italics ours.)

The quotation demonstrates that this Court, as early as 1877 when the case was decided, felt and expressed the opinion that the Act empowered a taking in fee.

We now proceed directly to the question as to whether or not the Act empowered the City, under proper circumstances, to take a fee simple title in land condemned. It would be a futile gesture, we think, to repeat in any great detail the provisions of the Act set forth above, for they are very similar to, and in some instances identical with, the provisions of the enactment involved in *Johnson, supra.* In fact, a careful examination of the two reveals that the Act in the case at bar is more explicit in authorizing an absolute taking than the one in *Johnson.* We shall state or repeat only a few short excerpts from the Act, which we consider very cogent. In Section 1,

after authorizing the purchase, lease, etc., of real estate, spring, brook, etc., in "fee simple" or for a term of years, and also "the right to use and occupy forever or for a term of years," the City is "invested with all the rights and powers necessary for the introduction of water into said city * * *." And in Section 2, after stating that if the parties are unable to agree upon the *purchase* of any *land,* etc., which the City deemed expedient or necessary, then the jury should assess the money to be paid by the City "for the land, spring, brook, water rights or other property which [the City deems] necessary *to purchase and hold* or *use for the purpose* * * *." The use of the disjunctive in the last sentence indicates to us that the Legislature was drawing a distinction between property that was to be *purchased and held* and property that was merely to be *used,* namely, that absolute title could be obtained to that which was to be purchased and held, and something less than absolute title to that which was simply to be used. Compare *Taylor v. Baltimore, supra.* Finally, the Act provides that the inquisition "shall describe the property taken * * * and the *quantity* or *duration* [italics ours] of the interest in the same * * *" and the payment or tender of the damages assessed "shall entitle [the City] to the *use, estate* and interest in the same * * * as fully as if it had been conveyed by the owner or owners * * *." We think the Legislature could and would have used much simpler language than this and the other quotations made at the beginning of this opinion, had it intended to limit the taking to mere easements. Should we labor the question further, we will only find ourselves repeating what we said in the *Johnson* case. There, we held that under Chapter 123 of the Acts of 1826, an act very analogous to our Act and less specific, in our judgment, in empowering a fee simple taking, the condemnor could and did take fee simple title to the land condemned. We see no need to elaborate further upon the question. The rulings in *Johnson* are, we think, controlling here, and we hold that, under proper circumstances, the Act empowered the City to acquire fee simple title by condemnation.

We add this paragraph in which we repeat some of what we have said above. Appellants, insistence that the City could not, under any circumstances, acquire under the Act a fee simple

estate because it was limited to taking the "use and occupancy" for, and only for, the purpose of "supplying [the City] with pure water" cannot prevail. Of course the general purpose named in the statute meant what it said. Under it, the City was not empowered to condemn land in Baltimore County for a municipal stadium, a garbage disposal plant or any other municipal purpose except that named in the Act. But when property is condemned in good faith for the named public purpose, the necessary quantum (or quantity), or duration of the estate taken is ordinarily left to the sound business discretion of the condemnor, and if after a reasonable and bona fide use of a fee simple estate taken for the named public purpose, the land is no longer needed or desired for use for that particular purpose, the condemnor is at liberty to deal with the real estate in any legitimate manner that he sees fit, and neither the condemnee nor those claiming under him may object. *Johnson, supra.* See also *Ligon v. Potomac Electric Power Co., supra;* 3 Nichols, *Eminent Domain,* § 9.36[4].

## II

This aspect of our question does not require a lengthy discussion. Above we quoted from most, if not all, of the writings returned by the sheriff to the clerk in order to show that in none of them is there any intimation that only an easement was required in the taking, unless the phrase "use and occupation" contained in several of them can be construed as connoting the same. The same situation occurred in *Johnson, supra.* We disposed of the matter thus:

> "While the form of the oath in section 15 * * * refers to 'the use or occupation of the same required by the company,' the jury was directed * * * to describe in the inquisition 'the property taken, or the bounds of the land condemned, and *the quantity or duration of the interest in the same* * * *.' * * *. We think it is clear that the power granted to the condemner * * * was not confined to the acquisition of mere easements but authorized it, in the exercise of its sound business judgment as to what was necessary or desirable, to acquire complete or fee simple title."

In the inquisition in *Johnson,* the interest in the land taken was described as "an absolute estate in perpetuity." It was seriously contended that such an interest did not constitute a "fee simple" estate, but we held that it did. In the case at bar, the sheriff's return shows that the jury was specifically directed to assess the value of the "fee simple" estate in the land condemned, and the inquisition explicitly assessed the value of the "use and occupation of the * * * land * * * the Fee Simple thereof * * *." It is clear to us that the term "Fee Simple" was used to describe the "use and occupation" to be made of the land condemned, *i.e.,* the condemnor was taking a fee simple estate therein. If more were needed to show that a fee simple estate was intended to be and was acquired by the condemnation proceeding, it will be noted that not only was the land included in the assessment of damages, but also the "appurtenances" thereto. Ordinarily, appurtenances are not conveyed with a mere easement. Also, it will be noted that the use of a private road was retained by the owner and his heirs and assigns from "the *taking,* use and occupation [italics ours]." Again, it would be unusual (although concededly permissible under some circumstances) for the owner of land to retain a right of way over property to which he had retained title, although he had granted an easement therein to others.

Appellants earnestly argue and insist that we cannot make the above holdings without overruling *Kane v. Baltimore,* 15 Md. 240. To use the vernacular, they practically "hang their hat" on this decision. We are unable to agree.

We do agree that the *Kane* case is unusual in several aspects, and, in order to understand it, as fully as possible, a careful examination of its report in 15 Md. 240 and the early decisions thereafter must be examined, for we are informed that a diligent search reveals that the original records in the case are no longer available.

The case originated under the Act involved herein. The facts stated in the report prior to the opinion follow. One Tonge had a leasehold interest in a tract of land through which a stream —Jones' Falls—flowed, and on which land and stream was a merchant flour-mill. The City condemned "a part of this land, constituting the bed of the stream." The inquisition stated:

"* * * said * * * parcel of land, with all water rights whatsoever thereto attached, together with the leasehold and *fee simple estate* therein, is required by" the City. (See later where a very vital provision in this writing was apparently left out of this statement of facts.) This inquisition was confirmed, and before the damages assessed were paid to Tonge, the City filed an interpleader after learning that others claimed interests in the property condemned. Pending this litigation, Tonge applied for the benefit of the insolvency laws. The interpleader resulted in a decree being passed therein awarding the City "the entire *fee-simple* estate" in the lands condemned, directing the damages to be paid to a trustee, and instructing the trustee to distribute them to those entitled thereto.

Tonge's trustee, under order of court, sold all of the tract of land, mill and improvements owned by Tonge (or his leasehold interest therein), subject to such rights as the City had acquired by the condemnation, to George P. Kane. About 6 months after its acquisition, Kane brought suit against the City praying that it be enjoined from injuring and destroying the dam to his mill and from interfering with him in such use of the water "as does not interfere with the use of the same by [the City]" for supplying Baltimore with water. The injunction was granted, but was later dissolved, and Kane appealed.

The following additional facts are stated in the opinion. The injunction suit alleged that another suit had been instituted to test the respective rights of the parties, and the City was about to blow up the immense natural rocks that were the abutments to the dam, and, if blown up, they could not be replaced by any artificial structure. The bill further alleged that the only use made of the water by Kane was to run it over his mill wheel rather than the top of the dam, and this was done without impairment of quantity or quality of the water; in fact, the City anticipated getting its water from a source above that of Kane's land. The bill then states that the City should be restrained from further acts of trespass until the suit at law could be heard, and the City should be enjoined from interfering with Kane's such use of the water "as does not interfere with the use of the same [by the City]" for supplying its inhabitants with water.

The City based its claim upon the fact that it had obtained an absolute fee simple estate under the condemnation proceeding and laid considerable stress upon the decree in the interpleader case, which, as we noted above, declared that the City was "entitled to a fee-simple estate in the property * * *." In dealing with this phase of the case, which in our judgment is the real nub of the decision, the opinion states: "In our opinion, the decree did not alter or enlarge the rights of the city, acquired under the condemnation. That [the condemnation] conferred upon the city, in perpetuity, the use and occupation of the stream, for *the purpose mentioned in the Act,* but left in Tonge, 'all such use of it as did not injuriously interfere therewith.' " The opinion itself does not state specifically why the latter part of the above sentence is embraced within quotation marks, or from what source the quotation came, but the only fair and reasonable inference to be drawn therefrom is, we think, that it was taken from the inquisition. The Court at that stage was speaking of the condemnation proceeding, and it will be noted that the injunction prayed for was in substantially the same language, which, to us, is an additional indication of the probability that the quotation was taken from the inquisition. Further, we pointed out above that the inquisition in one part said that the "parcel of land, with all water rights whatsoever * * * together with the leasehold and *fee simple estate* therein, is required" by the City, and assessed the damages for "the taking, use and occupation aforesaid." In view of this language, it is difficult for us to square the result reached by the Court in *Kane,* which was that the injunction should be continued, with other decisions of the Court of Appeals, unless there was some qualification of this rather explicit language. If the above language were in the inquisition, it clearly explains the Court's holdings. Thus if we are correct in our inference drawn above, all of the difficult-to-explain features of the decision fade away. Included among these features is the very serious one as to why the Court, in a collateral proceeding two years after the confirmation of the inquisition, which granted the City a "fee simple estate" in the property condemned, held that the estate taken was less than a fee simple one, when, at that time, an order ratifying an inquisition was final and conclusive in nature, and no appeal therefrom was permitted.

But if we lay aside the above inference and any consideration of the Court's action in ruling upon a question that had probably become final and conclusive, the case still, in our opinion, has no great or controlling significance here. Although there is some rather general and sweeping language used in *Kane,* the Court did not hold that an absolute fee simple could not be condemned under any circumstances under the Act. *Appellants' counsel admitted that it could.* 15 Md. at p. 251. And as we pointed out above, *Taylor v. Baltimore, supra,* specifically so stated (with C. J. Bartol participating in both decisions). The Court in *Kane* held in effect that if the condemnation proceeding attempted to take from the owner *the use of the water which did not in anyway interfere with the City's use thereof for supplying water to the City,* then the taking of that *use* from the owner was not a taking thereof for a *public* purpose, and hence unconstitutional. We do not have that question in the case at bar. Here, we have a fee simple estate taken in good faith for a public purpose and utilized for that public purpose for many, many years, and, after being no longer needed for that specific purpose, used for another public purpose. We know of no constitutional or statutory provisions or decisions of this Court proscribing such action. On the contrary, such decisions as *Johnson, supra,* specifically recognize its legality. Also compare *Ligon v. Potomac Electric Power Co., supra.*

Should we adopt appellants' argument that no fee simple estate could be condemned under the Act and afford literal construction to such excerpts (taken out of context) as that in *Baltimore v. Bouldin,* 23 Md. at p. 373, which states, *"Kane v. Baltimore,* * * *, shows that the title acquired by condemnation, is not an absolute, unqualified fee, but an appropriation of private property to public use, consistent with the objects * * * for which it is condemned," it would seem to lead to a conclusion that it is not constitutional in Maryland to condemn a fee simple title. Although recognized and applied in some early decisions in the country (and possibly still so recognized in some jurisdictions) to state such a proposition in Maryland today is somewhat preposterous. We have already cited decisions of this Court, which say that condemnation of fee simple

estates, under proper circumstances, are constitutional and there are many others. As indicated above, to adopt such a proposition would be contrary to our holdings in such cases as *Johnson* and *Ligon,* both *supra,* wherein *Kane* was not even cited.

Appellants cite to us quotations from the works of four eminent Maryland jurists and lawyers: Judge Niles, *Maryland Constitutional Law,* p. 198; Judge Eli Frank, *Title to Real and Leasehold Estates,* p. 219; Major Venable, *Syllabus of Lectures on Title to Real Property and Leasehold Estates,* p. 18, and Tiffany, in volume 4 of his work on *The Law of Real Property* (3rd ed.), p. 682. For these predecessors at the bar, we have the highest esteem and respect. We have carefully read their statements, and we are unable to find anything therein which substantially differs from our holdings above.

As previously indicated, we do not believe our holdings herein conflict with those in *Kane, supra,* but to the extent, if at all, that they do so conflict, *Kane* is hereby overruled. (If appellants' interpretation of the decision be correct, it has already been overruled *sub silentio* in substantial part by such cases as *Johnson* and *Ligon,* both *supra.*)

From what we have said above, Judge Proctor's rulings should and will be affirmed.

*Order affirmed, with costs.*